## Daisey's Adoption

*T. Lane Bean,* for petitioner Peterson.
*Kratz, Moran & Hillegass,* for petitioner Lockwood.

HOLLAND, P. J., July 11, 1933.—The petitioner, Marie J. Peterson, is a woman 42 years of age, residing at Audubon, Lower Providence Township, Montgomery

County. Her residence consists of an old house, renovated so that it is intended to retain the atmosphere of an antique house, but having had installed therein modern conveniences. The house is situate on a 16-acre plot of ground. Mrs. Peterson, the petitioner, has been married three times. Her last husband deserted her, and they have been living apart for a period of over 5 years, during which time he has contributed nothing to her support, and it appears from the testimony that she does not know his present whereabouts. She is a laboratory technician by profession and is engaged in employment with a physician in Reading, Pa., as physician's secretary and laboratory technician. She has continuously followed this profession for a number of years and has supported herself from her early girlhood, or at least definitely, according to the testimony, since 1924. She was married for the first time in April 1919, to a man by the name of Hendrickson and was subsequently divorced from him. She later married a man by the name of Watson, who died, and her last husband, Peterson, she married September 21, 1926, and lived with him but a few weeks when he deserted her, and he has persisted in such desertion ever since and has never contributed to her support. As far as the testimony discloses, she has no knowledge of his whereabouts. Her mother died in 1925 or 1926, at which time she inherited some estate from her, and she has income of a trust fund of $16,000 of which the Woodbury Trust Company of Woodbury, N. J., is trustee, the principal of which she is to receive at the death of her brother, Warner Jenks Macfarlane.

Petitioner seeks to adopt Ruth Geraldine Daisey (hereinafter referred to as "the child"), who was born April 7, 1924, at Women's Hospital, 2137 North College Avenue, Philadelphia, the mother of said child being one Naamah Daisey and the reputed and acknowledged father Warner J. Macfarlane, the brother of petitioner. As the genealogy of the child on the maternal side is important, we will briefly outline her maternal relations having any bearing upon this case.

One Mary E. Daisey of Frankford, Del., married a man by the name of Daisey, who already had at least one child by a former marriage, Viola Beatrice Daisey (since married and now Viola Beatrice D. Weinski). Of this marriage there were born Sarai H. Daisey (since married and now Sarai H. Lockwood) and Naamah Daisey. Said Mary E. Daisey is therefore the mother of Sarai H. Lockwood and Naamah Daisey, and the stepmother of Viola Beatrice D. Wienski. It should be stated also at this time that Naamah Daisey subsequently married one William G. A. Swann, with whom she was living when she died on March 12, 1932.

The said Naamah Daisey having left her home in Frankford, Del., and come to Philadelphia, where she was working, became involved with the said Warner Jenks Macfarlane, with the result that she became pregnant and gave birth to the child in question April 7, 1924, as above stated. She never advised her mother of her condition, nor did her mother know of the birth of the child until several months thereafter. The natural father of the child, Warner Jenks Macfarlane, however, advised his sister, the petitioner, of the impending birth of the child and asked petitioner to take care of her.

About 10 days after the birth of the child in the Woman's Hospital, petitioner was advised by the social workers connected with the hospital that Naamah and her child had no place to go. It also appeared that she was suffering from a disease, so that the hospital authorities desired her to leave. The petitioner took the mother and the child to her own home, which was then at 1820 Pine Street, Philadelphia, where she kept both Naamah Daisey, the mother, and the child in her home, where she was residing with her own mother,

for a period of a year and a half and maintained them exclusively from her own funds. Petitioner at that time was working as secretary and technician to Dr. Orlando Petty of 1529 Pine Street, Philadelphia. The mother and child therefore remained at this home of petitioner from some time in April 1924 until about October 1925. It seems that in the summer of 1924 she visited her mother in Frankford, Del., with the child but returned to petitioner's home, where she remained as aforesaid. She then left, taking the child with her, and went to New York, where she stayed a day or so and then went on to Hartford, Conn., to the home of her stepsister, Mrs. Weinski, where she stayed about 2 weeks, and then went to stay with friends of the father of the child (the brother of petitioner) on Long Island, where she and the child stayed a month or two.

Up to this time, petitioner kept in touch with her. In the meantime, petitioner's mother died, so that some money came from her mother's estate to her and some to her brother. Her brother authorized her to turn the proceeds of certain furniture over to Naamah for the support of herself and her child. The petitioner turned this money over to her in approximately the sum of $733, and after she received it she took the child and disappeared as far as'petitioner was concerned.

The next petitioner heard from Naamah was in May 1926, when she received a letter from her from New York, and in June 1926 Naamah and the child came to visit the petitioner at the latter's home at Woodbury Heights, N. J., for a week-end. She then left, telling petitioner she was going to Frankford, Del.

The next petitioner heard from her was to the effect that she, Naamah Daisey, had been married July 2, 1926, to one William G. A. Swann. The petitioner received this information from a letter written her by Naamah Daisey from New York, dated July 4, 1926. The said Naamah Daisey Swann lived with her said husband in New York City from July 2, 1926, until the time of her death March 12, 1932, and the child lived with her and her said husband during this entire period and her said husband supported the child and maintained it as his own. During this period of her married life, petitioner would visit Naamah Swann and the child in New York City about three times a year, and wrote to Naamah every month. Naamah also came to see the petitioner several times at her place of employment during one period of the time, when she was employed as technician with one of the insurance companies. The last time petitioner saw Naamah and the child together was around Christmas 1931, at petitioner's present home in Audubon. Petitioner in her testimony alleges that upon this visit Naamah, the mother of the child, in effect told her that, if anything happened to her (Naamah), she desired petitioner to take the child and raise it.

As heretofore stated, Naamah died March 12, 1932. Petitioner had not been informed of her illness, nor did any member of her family or her husband notify petitioner of her death. The only notice of her death received by petitioner was a letter which was signed "Miriam", but petitioner does not know the identity of this person who wrote her the letter. Upon receipt of the notice of Naamah's death, she sent a card to Mr. Swann and a letter to Mrs. Weinski. It does not appear, however, that she attended the funeral or went to New York upon the event of her death.

What transpired with reference to the child at and immediately after the death of the mother, Naamah, is disclosed by the testimony of Sarai Lockwood, Mary Daisey, and Mrs. Weinski. According to the testimony of Sarai Lockwood and Mrs. Daisey, and also Naamah's husband, Mr. Swann, Naamah's body was taken to Frankford, Del., for burial. Upon the occasion of the funeral and burial, Mrs. Daisey, Mrs. Lockwood, the husband of the deceased, the child and Mrs. Weinski all went to Frankford, Del. Mrs. Daisey had been called to

her daughter's home during her last illness and was there some time before her death. Mrs. Lockwood came to Naamah's home immediately after her death. The entire party therefore being together in the New York home accompanied the body to Frankford, Del., as indicated. The funeral and burial having been had in Frankford, Del., the same persons returned to the Swann home in New York, that is, Mr. Swann, Mrs. Daisey, Mrs. Lockwood, Mrs. Weinski, and the child. Within the next day or so, a question arose as to how the child was to be disposed of and in whose care she was to be placed. At this point, the testimony of Mrs. Lockwood, Mrs. Daisey, and Mr. Swann, on the one hand, and Mrs. Weinski, on the other, differ somewhat.

According to Mrs. Lockwood and Mrs. Daisey, corroborated by Mr. Swann, it was finally decided that Mrs. Weinski was to take the child to Hartford to finish the school year there, and that Mrs. Daisey was to come to Hartford in June, get the child, and take her to Mrs. Lockwood's home in Philadelphia, where Mrs. Daisey was also residing. According to Mrs. Daisey, the reason why the child was not taken immediately to Mrs. Lockwood's home was because Mrs. Daisey felt that, on account of the fatiguing circumstances through which she had so recently gone, she preferred to have a rest before assuming the care of the child or at least before the child could come to the abode which she was also occupying. Whether the child after it arrived in the Philadelphia home of Mrs. Lockwood and Mrs. Daisey was to be in possession of Mrs. Daisey or Mrs. Lockwood is not entirely clear, according to this version. Mr. Swann stated in his testimony that he gave the child to Mrs. Daisey, his mother-in-law. The fact remains, however, that the child was taken by Mrs. Weinski to her home in Hartford, Conn.

According to Mrs. Weinski's testimony, Mrs. Lockwood wanted to take the child, but Mrs. Daisey, who lived with Mrs. Lockwood, did not want Mrs. Lockwood to do so because it would give Mrs. Daisey too much work, inasmuch as Mrs. Daisey takes care of Mrs. Lockwood's apartment and does the laundry for the beauty shops which Mrs. Lockwood runs as her business. Mrs. Weinski even states that Mrs. Daisey expressed a sentiment to the effect that she could not stand the sight of the child. Mrs. Lockwood did desire to take the child with her to Philadelphia, but Mrs. Daisey was opposed to the child coming to Philadelphia. It is to be gathered from Mrs. Weinski's testimony that Mrs. Lockwood desired to take the child, but Mrs. Daisey discouraged her from doing so and even expressed the suggestion that Mrs. Weinski should take the child.

As a result of the conference, according to Mrs. Weinski, she, with the consent of Mrs. Daisey and Mr. Swann, took the child to her home in Hartford for the purpose of keeping it indefinitely, sending it to school, and raising it. She further states that after the child arrived in Hartford with her some suggestion was made by Mrs. Lockwood whereby Mrs. Weinski would keep the child for 6 months and Mrs. Lockwood keep the child for 6 months. After she had the child for about 10 days, it proved inconvenient for her to continue to keep her, inasmuch as she had theretofore adopted an 18-months old child, and she also had difficulty in certain matters of discipline. She then communicated with the petitioner, and the petitioner informed her that her (the petitioner's) home in Audubon, Montgomery County, was and always would be open to the child. It was then that Mrs. Weinski decided that it would be to the best interest of the child to deliver her to the petitioner. She states that one of the contributing reasons why she came to this conclusion was that when they were all still in New York, at Mr. Swann's home, and he was clearing out some old things of Naamah's, they came across about 50 letters from the petitioner to Naamah which they read as they tore them up, and that these letters

expressed great affection for the child. According to the opinion of the witness, they were very "beautiful" letters, expressing beautiful sentiments of the petitioner for Naamah and the child. It occurred to the witness at that time, and also it occurred to her upon her remembering these letters after she had arrived in Hartford in her home, that the child would be very well off with the petitioner as she seemed to have such great affection for her. Furthermore, in the witness's opinion, there seemed to be an "affinity" between the petitioner and the child so that they got along very well, and the petitioner seemed to the witness to have a good influence upon the child and able to control her, and on account of their dispositions being harmonious she was sure they would get along very well together.

Acting on this opinion, she delivered the custody of the child to the petitioner. It is not entirely clear, but it seems that she brought the child by automobile from Hartford to the home of the petitioner at Audubon, Lower Providence, this county. The child was brought to the petitioner on or about March 26, 1932, and has remained with the petitioner ever since. As far as can be observed or learned, petitioner has taken very good care of the child, sent her to public school at Audubon during the remainder of the school year until June 1932, and maintained her in comfort at her home. At the time of the hearing, October 10, 1932, according to the petitioner, she had not put the child in school as yet, as she was not sure as to the determination of the present proceeding, but she had rented an apartment in Reading to keep the child there temporarily during the winter months, which arrangement was so that she could be near her own work, and had entertained the intention of putting the child in a private school.

It should be stated at this time that a similar petition for the adoption of the same child, Ruth Geraldine Daisey, was filed previous to the petition in the present proceeding, by Sarai H. Lockwood, the maternal aunt of the child, hereinbefore several times referred to. Mrs. Lockwood's petition was filed August 1, 1932. Both petitions were heard on the same day, October 10, 1932, and the testimony taken under each proceeding is considered in the disposal of this proceeding.

Further, it should be stated at this time that the court is put to a choice as to which adoption it will decree, the adoption of the child by this petitioner or the adoption of the child by Sarai H. Lockwood. The situation presents great difficulty, for the reason that both petitioners are clearly and beyond question qualified in every way to become the adopting parent of the child. The court therefore is put to a decision as to two decisive factors, first, as to which adoption will more promote the welfare of the child, and, second, what person or persons exist whose consent is necessary to an adoption under the terms of the act.

The first question to be considered is the question of jurisdiction. The Adoption Act of April 4, 1925, P. L. 127, as amended by the Act of April 26, 1929, P. L. 822, sec. 1, designates the orphans' court, either of the county where the petitioner or petitioners is or are residents or of the county in which the person to be adopted is a resident. In the case of the petition of Marie J. Peterson, it is obvious that the court has jurisdiction, as nobody questions that Marie J. Peterson is a resident of Audubon, Lower Providence Township, Montgomery County. As to the petitioner, Sarai H. Lockwood, she is admittedly a resident of the County of Philadelphia, so that if this court is to have jurisdiction of her petition it must be upon the ground that the child is a resident of Montgomery County. We are of the opinion that the child is a resident of Montgomery County, though the reason for our conclusion should be stated.

In the first place, the residence of an illegitimate minor child is the residence of its mother. This is such well-settled law that the citation of authority is scarcely necessary, and we will refer in passing only to the enunciation of the principle by Judge Gest in In re Saunders's Adoption, 13 D. & C. 755. The residence of the child, therefore, immediately prior to and at the time of the death of Naamah Daisey Swann, the child's mother, was New York City. Immediately after the death of the mother, however, it is obvious that the determining factor of the mother's residence had disappeared, and the residence of the child remained in New York, but from then on purely on account of her physical presence there. The deceased mother's presence could have no bearing upon her residence. She was then moved to Hartford by Mrs. Weinski, and thence from Hartford to Audubon, Lower Providence Township, where she has continued to reside.

Residence is ordinarily personal presence in a fixed and permanent abode. This is true except in the case of a minor where, as above indicated, when the minor is illegitimate, the mother's residence is the child's residence, and in the case of a legitimate child the father's residence is the child's residence. When, however, in the case of a minor, the determining factor of residence of the parent is removed by death, from then on the residence of the minor can be determined only by his or her actual personal physical presence in a definite abode. We doubt very much whether the intent of the minor can have any bearing as it does in the case of an adult person, for the obvious reason, especially in the case of a minor of immature years, that her presence and location is governed largely by some adult. Therefore, where a minor, such as this child in question, has dwelt in a permanent abode for several months, we believe it a proper conclusion that her residence is in the location where that abode is situated. In this case, the child has resided for several months in the home of the petitioner, Marie J. Peterson, in Audubon, Lower Providence Township, Montgomery County, and we therefore conclude and hold that the residence of the child is Montgomery County. Therefore, the court has jurisdiction also of the petition of Sarai H. Lockwood.

In the consideration of this petition, we need spend little time on the question of the fitness of the petitioner. Her life history, as above outlined, shows her to be a woman undoubtedly of responsibility and of the highest character. She has perfected herself in a profession and has practiced it for a number of years, maintained herself, and accumulated some substance. The nature of her employment and the nature of her work indicates that she must be a person of high intelligence, responsibility, and character.

The next question to decide is whether there is any person whose consent is necessary to this adoption, and, if so, who that person is. Section 2 of the Adoption Act of 1925 designates whose consent is necessary to an adoption. Clause (a) of said section requires that the person proposed to be adopted shall give his consent if over 12 years of age. The consent of said person's husband or wife, if any, must be had. Of course this does not apply to this case, as the child is considerably less than 12 years of age, and, of course, being so young, is not married.

Clause (b) of said section requires the consent of the adopting parent's husband or wife, unless they jointly adopt said person. The petitioner, Marie J. Peterson, as above set out, has a husband, one Peterson, who has deserted her, and has persisted in the desertion continuously for upwards of 5 years. His whereabouts are unknown to her, and of course he has not joined in the petition or given his consent thereto.

As to what effect the desertion of the spouse of the petitioner has upon the necessity of said spouse's consent to the petition, the act is silent, and there

is no case decided to guide us upon this point. This clause of this section of the act simply says that consent of the adopting parent's husband or wife is necessary. We are of the opinion, however, that the legislature never intended to make essential or necessary the consent of a spouse who had deserted and persisted in desertion of the petitioner. It seems clear to us that the theory of the act in requiring the consent of the spouse of the petitioner is that the accomplishment of an adoption of a person by one of the two parties to the married relation necessarily introduces into the family of the married people an interference affecting both of them.

In the first place, it adds an additional expense for the keep and maintenance of the person proposed to be adopted, especially if he is of immature years, which expense would have to be borne by the husband of the marriage, ordinarily. Furthermore, from the point of view of the husband, it is bound to divide the attention of his wife between him and the person proposed to be adopted. As to both husband and wife, if either is adopting a person, it thereby reduces the prospect of the spouse of the petitioner for adoption, of the quantum of interest in the said petitioner's estate in case of his or her death. In brief, it is clear that the theory of the necessity of the consent of the spouse of the petitioner is that, inasmuch as said spouse's marital rights as such are affected, his or her consent must be necessary.

If this is the theory of this part of the act, as we believe it to be, then where the spouse of the petitioner has voluntarily, by his own conduct, as the desertion of the petitioner in this case, abandoned all his marital rights and forfeited them, thereby removing the necessity of protecting him from any interference by the adoption in his marital rights, it must necessarily follow that the legislature intended that in such case his consent would not be necessary.

Applying this theory to the present case, the husband of this petitioner having deserted her and continued in the desertion for a period of over 5 years, thereby forfeiting any possible right he has either as to her services, her society or company, or her property, there is no possibility of him being injured in any way by her adopting the child. Therefore, his consent would not be necessary, and we so hold.

Clause (c) of this section requires, in the case of an illegitimate child, the consent of the mother only be had, unless the father has acknowledged the child, but that the consent of the parent who has abandoned the child is unnecessary if the fact be proven to the satisfaction of the court.

Of course, the mother of the child in this case is deceased, and her consent is beyond obtaining. The natural father of the child, who is the brother of the petitioner, although he has acknowledged the child, has clearly abandoned the child and continued in the abandonment practically since its birth, which we find as a fact. It will be remembered from the facts as we stated them above that the natural father never took any interest in the child or furnished any support excepting $733, which he had the petitioner give the mother of the child. There is no evidence that he ever saw the child or made any inquiry about it, but he in fact abandoned it at its birth and continued in the abandonment to the present time and, with the exception of the very small sum of money, never contributed anything to its support. It can scarcely be said that the sum of $733, spread over a period of some 9 years, amounts to any support of the child. His consent therefore is not necessary.

Clause (d) of this section provides that if the person proposed to be adopted has no father or mother living, or whose consent is necessary, then the consent of the legal guardian is required, if there be one, and of the person or persons having the legal custody of the child, if any such person can be found.

We have found that the consent of the mother, she being deceased, cannot be had, that the consent of the natural father is unnecessary, and it is an admitted fact that the child has no legal guardian. We are therefore put to an inquiry as to whether there is any person having the legal custody of the child.

To determine this question, it is necessary to trace the movements of the child up to a point at which there is no doubt as to the legal custody. It is beyond argument that the child's mother, Naamah, had the legal custody of her prior to and up to the date of her death, March 12, 1932. It will be remembered that during this period the child resided with her said mother and her stepfather, Mr. Swann, in a home provided by Mr. Swann. The legal custody, however, was clearly in the mother of the child, Naamah. Immediately upon the death of the mother, Naamah, her custody of the child obviously ceased. Therefore, by force of the circumstances leading up to the event of her death, the physical presence of the child remained in the household of her stepfather, Mr. Swann, and it would seem that immediately upon the death of the mother, Naamah, the custody of the child by gravity of circumstances fell into Mr. Swann, the step-father. Certain it is that, there being no adjudication by a court of competent jurisdiction as to the legal custody of the child from the time of the death of the mother, Naamah, to the present time, there was no legal adjudication immediately after her death, and, as above stated, by gravity of circumstances the actual physical possession of the child being in the stepfather, Mr. Swann, his custody was good as against the whole world until the legal custody was thereafter adjudicated by a court of competent jurisdiction. We find, therefore, that upon and immediately after the death of the mother, Naamah, the child was in the legal custody of the stepfather, Mr. Swann.

True it was that Mrs. Daisey was present in the home of Mr. Swann when Naamah the mother died, but she was no part of his household but only a temporary visitor, and it appears to the court that as between her and Mr. Swann, Mr. Swann clearly had the possession of the child at that time. Certain it is that Mrs. Lockwood never had any possession of her after the death of Naamah, as she did not arrive in the household until sometime after Naamah died and was, even more than Mrs. Daisey, a visitor in the household of Mr. Swann. To the above reason given for our opinion that at that time Mr. Swann had the legal custody of the child, may be added these last recited facts, which would indicate the legal custody of the child to be at that time in Mr. Swann by a process of elimination.

The possession of the child was next transferred to Mrs. Weinski by Mr. Swann with the consent of both Mrs. Daisey and Mrs. Lockwood. If we are to believe Mrs. Weinski, the legal custody and possession were turned over to her by Mr. Swann without any qualification whatsoever. We are inclined to believe her testimony on this point, as she seems to be the one absolutely disinterested witness having only the welfare of the child as her primary and only motive. True it was that she seemed to have some feeling against Mrs. Lockwood, arising out of some untoward circumstances occurring in her early life. Her version of the facts, however, is convincing because even though Mrs. Daisey or Mrs. Lockwood had entered into considerable discussion about taking the child at a later date, in June 1932, according to their testimony, still at the time of the delivery of the child to Mrs. Weinski by Mr. Swann it is not clear just exactly what their intent was. In fact, after the child was in the possession of Mrs. Weinski and settled in her home at Hartford, Conn., there was still discussion between Mrs. Weinski and Mrs. Lockwood as to various arrangements, such as the child remaining 6 months of the year with Mrs. Weinski and 6 months with Mrs. Lockwood.

668

But even taking the version of the facts as testified to by Mrs. Daisey and Mrs. Lockwood, it was at most that they were to assume, or rather Mrs. Lockwood was to assume, the legal custody of the child at some future time, to wit, June 1932, and as for Mr. Swann, when he turned the child over to Mrs. Weinski he absolutely abandoned and disclaimed all further possession or custody of the child. As he explained, he had a child of his own to look after. We are therefore, under any view of the testimony, either of Mrs. Weinski or of Mrs. Lockwood and Mrs. Daisey, forced to the conclusion that when Mr. Swann turned the child over to Mrs. Weinski he then and there transferred the legal custody of the child to Mrs. Weinski, which she retained until given up by her either by the agreement alleged to have been entered into, according to Mrs. Lockwood and Mrs. Daisey, or in accordance with some subsequent arrangement. The fact remains, as it appears to this court, that when Mrs. Weinski took the child to Hartford she had the legal custody of it. Here again it is certain that she had the legal custody of the child against all the world until the question of legal custody was otherwise adjudicated by a court of competent jurisdiction. She, having the legal custody of the child, on March 26, 1932, turned it over to this petitioner, Mrs. Peterson. The child has remained in the possession of Mrs. Peterson in this county ever since, and we are again forced to the conclusion that the legal custody of the child is in her, for the same reason heretofore stated with reference to the possession of Mr. Swann and Mrs. Weinski. Here again, it is certain that Mrs. Peterson has the legal custody of the child against all the world until the question is adjudicated by some court of competent jurisdiction, and it has never as yet been done. We therefore find that at the time of the filing of both these petitions legal custody of the child was in this petitioner, Mrs. Peterson.

This petitioner, Mrs. Peterson, being the petitioner in this proceeding, consents to the adoption of the child by herself and it is upon the record that she does not consent to the adoption of the child by Mrs. Lockwood, the petitioner in the other proceeding.

All of the requirements, as heretofore stated, having therefore been fulfilled by this petitioner, it inevitably follows that her petition must be granted and a decree of adoption by Mrs. Peterson of the child executed by this court, and that the petition of Mrs. Lockwood will have to be dismissed.

There is another angle to the case, however, which we should not pass without comment, as it would lead us to the same conclusion through a different avenue of approach. Certain it is, if the court is in error in tracing the legal custody of the child according to the above method and finally finding it lodged in this petitioner, which would make the court in error in its ultimate conclusion that this petitioner has the legal custody of the child, then the court is at a loss to determine who would have the legal custody.

Section 2(d) of the Act of April 26, 1929, P. L. 822, amending the Act of April 4, 1925, P. L. 127, provides . . . "if such child has no father or mother living or whose consent is necessary hereunder, and no legal guardian, and no person can be found who has the legal custody of such child, and the same be proven to the satisfaction of the court or judge hearing the petition, the said court or judge shall so find as a fact".

If the court had not found Mrs. Peterson, the petitioner, had the legal custody of the child, then the court, as above indicated, would have had to find that no person can be found who has the legal custody of said child.

Exclusive of Mrs. Peterson, this petitioner, the evidence does not disclose any person in the whole world who is in a position to demand the custody of

the child and, as has many times hereinbefore been stated, the question has never been heretobefore adjudicated by any court of competent jurisdiction. The court in such case would be reduced to the single question as to which adoption by either of the two petitioners would better promote the welfare of the child.

In adoption, the paramount question to be considered is the welfare of the child. In view of the obvious spirit of the statute, authority scarcely need be quoted for this proposition, but we nevertheless refer to In re Atticks's Adoption, 16 D. & C. 760, and In re Adoption of Don Victor Mountz et al., 7 Wash. Co. 54, which authorities accentuate this particular principle.

Having found as a fact that this petitioner, Mrs. Peterson, has the legal custody of the child, and that she is a proper person to become the adopting parent and that the adoption by her would be conducive to the welfare of the child, it is not necessary for us to go into the question whether an adoption by her or the other petitioner, Mrs. Lockwood, would better promote the welfare of the child. However, were we forced to go into the question we would arrive at the same conclusion. Under all the evidence we would be of the opinion that the welfare of the child would be better promoted by the adoption of her by Mrs. Peterson.

It is not to be inferred, however, from this conclusion that we would regard Mrs. Lockwood, the other petitioner, as not being a fit and proper person in every way to be the adopting parent of the child. Both women are of the highest character and type, and the child would be indeed fortunate to have either for her adoptive parent, and the margin which would turn our decision in favor of Mrs. Peterson is indeed very narrow. Mrs. Weinski probably touched the keynote of this distinction when she stated that the child and Mrs. Peterson had somewhat of an "affinity" for each other. Furthermore, the evidence unequivocally indicates that from the birth of the child it, together with its natural mother, was mothered and cared for by the petitioner, Mrs. Peterson, every time she had an opportunity to be of service to them. Her affection for the child continued and was evidenced even when circumstances separated her from it. She has been devoted to the child since birth, and since the physical possession of the child has been in her she has proven her intention to make every sacrifice in her behalf and to look after her health, education, and general welfare with the tenderest and most intelligent solicitude. Bearing in mind that the primary purpose of this inquiry is to determine the welfare of the child, we would be of the opinion that her adoption by the petitioner Mrs. Peterson would better accomplish the major object.

And now, July 11, 1933, the prayer of the petition of the within petitioner, Marie J. Peterson, for the adoption by her of Ruth Geraldine Daisey is granted, and counsel for said petitioner is directed to draw and submit to the court a decree of adoption in compliance with this opinion.

### Sur petition of Sarah H. Lockwood

Inasmuch as we have of even date herewith granted the prayer of Marie J. Peterson for the adoption of Ruth Geraldine Daisey for the reasons and upon the ground set out in the opinion in that proceeding filed this day, this petition will have to be dismissed.

It will be unnecessary for us to discuss the facts, the law applicable thereto, or our reasons for the conclusion we have arrived at in dismissing this petition, as all have been thoroughly considered in the proceeding hereinabove referred to.

We desire, however, to repeat and reiterate what we said in our opinion in the other proceeding with reference to the petitioner in this proceeding, Mrs. Lockwood.

It is to be thoroughly understood that the petition of this petitioner, Sarai H. Lockwood, is not dismissed on any ground of unfitness on her part. On the contrary, we desire to make it clear that the court regards the petitioner, Mrs. Lockwood, as in every way qualified as to character, education, and the home that she maintains, to become a proper and appropriate adopting parent to a child, but for the other reasons, both as to evidence and law, clearly set out in the proceeding wherein Marie J. Peterson is the petitioner, we have found it expedient to grant the petition of the other said petitioner and dismiss the petition of this petitioner, Sarai H. Lockwood.

And now, July 11, 1933, the petition of the petitioner, Sarai H. Lockwood, for the adoption of Ruth Geraldine Daisey is dismissed at the cost of the petitioner.

From Aaron S. Swartz, Jr., Norristown, Pa.